1  JODI LINKER, Bar Number 230273
   Federal Public Defender
2  Northern District of California
   ANGELA CHUANG, Bar Number 313445
3  Assistant Federal Public Defender
   19th Floor Federal Building - Box 36106
4  450 Golden Gate Avenue
   San Francisco, CA 94102
5  Telephone:   (415) 436-7700
   Facsimile:   (415) 436-7706
6  Email:       Angela_Chuang@fd.org

7

8  Counsel for Defendant Addleman

9

10              IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,          **Case No.:** CR 23–22 JD

15          Plaintiff,                 **DEFENDANT'S SUPPLEMENTAL
                                        SENTENCING MEMORANDUM**
16      v.
                                       **REDACTED**
17  NICHOLAS ADDLEMAN,
                                       **Court:**          Courtroom 11, 19th  Floor
18          Defendant.                 **Hearing Date:**   April 28, 2025
                                       **Hearing Time:**   10:30 a.m.
19

20

21

22

23

24

25

26

27

28

Nicholas Addleman hereby submits the instant memorandum to update and supplement his previously filed sentencing memorandum and supporting materials. *See* Dkt. Nos. 68–70, 75.

**INTRODUCTION**

Last February, as sentencing approached in this matter, Mr. Addleman made the terrible mistake of absconding from pretrial supervision. In the time leading up to that poor decision, he was overwhelmed with anxiety about what the future would hold and was at a precarious stage in his recovery from a decades-long drug addiction. He had recently entered a crucial transitional stage where he moved from a structured, highly controlled inpatient treatment environment at New Bridge to a far less structured SLE. Though he had excelled during his 90 days at New Bridge, the move from an extremely regimented environment in which he was fully insulated from the outside world to one in which there was significantly less oversight and support proved to be too much for him to handle at that stage in his recovery. He relapsed and panicked, slipping back into old, self-destructive habits. Hindsight being 20/20, it is clear looking back that Mr. Addleman's recovery had not progressed to the point where he was ready to transition to a sober house with substantially more freedom than he had had at New Bridge. He was not as prepared as he thought for that transition, and spiraled back into poor decision-making.

Mr. Addleman now comes before this Court with much chagrin and regret for his misguided choices. He had made significant progress during his time at New Bridge in addressing the root causes of his criminal behavior—namely, his essentially lifelong drug addiction, underlying mental health issues, and a childhood rife with abuse and other traumas. But to truly recover from such an extensive history of trauma, addiction, and poor judgment is a long-term, lifelong process that oftentimes cannot be fixed overnight or in a few months. And as it turns out, what Mr. Addleman needed was more time in the setting of a highly structured inpatient program—where he thrived— before attempting the transition to a sober house and outpatient treatment. His absconding from pretrial supervision and falling back into old bad habits represents another manifestation of his tendencies to engage in self-harm, a destructive coping mechanism that dates back to his chaotic childhood.

Importantly, Mr. Addleman is taking responsibility for his mistakes and for giving into

1    temptations while he was in such a fragile place. It was extremely difficult for him to contemplate

2    leaving his family, but he knows there is no excuse or justification for what he did, and that he should

3    have self-surrendered. He accepts the consequences for his rash decisions, the clearest indicator for

4    which is that he is now recommending, jointly with the government, a sentence of 84 months—a

5    significantly harsher sentence than what he had originally requested from the Court. Such a sentence

6    would be appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

7                                                        **ARGUMENT**

8          Mr. Addleman agrees with the Guidelines calculation in the Presentence Report ("PSR"), with

9    a final offense level of 19 and a Criminal History Category ("CHC") of V. *See* PSR ¶¶ 32, 45. The

10   resulting advisory Guidelines range is 57–71 months. In acknowledgement of the aggravating

11   circumstances of his poor decision to abscond prior to sentencing last year, he jointly with the

12   government recommends a sentence of 84 months. Such a position, wherein he is requesting an

13   above-Guidelines sentence, reflects extraordinary accountability for his actions.

14         The government focuses much of its memo on allegations that Mr. Addleman engaged in new

15   criminal conduct while in warrant status. Mr. Addleman does not believe that an upward departure is

16   warranted under U.S.S.G. §§ 3C1.3, 2K2.1(b)(1)(A), and 5K2.0(a)(1)(A), but submits that an upward

17   variance to 84 months would suffice. The alleged new criminal conduct is separate from Mr.

18   Addleman's commission of the charged offense, which involved a discrete incident of passive

19   possession of firearms in October of 2022. At this juncture, those uncharged allegations—while

20   serious—are just that and nothing more. Mr. Addleman has not been arrested or charged with, let

21   alone convicted, of any of the alleged conduct. Should charges be filed in the future, which is an

22   unknown at this time, they will be tested and adjudicated in the appropriate forum at that point. For

23   purposes of the instant matter, at most, the Court can consider that these allegations exist, but should

24   place less weight on their significance, given that they are uncharged conduct. The defense, for its

25   part, has taken the existence of these allegations into account in jointly recommending an above-

26   Guidelines sentence of 84 months via an upward variance. Many defendants would not do that, and

27   Mr. Addleman's decision to do so speaks volumes about his willingness to accept responsibility.

28         From previous filings and the PSR, the Court is aware of Mr. Addleman's exceptionally

challenging background. His childhood was chaotic, to say the least. Much of his upbringing involved extensive emotional and physical abuse at the hands of his mother. PSR ¶ 59. This abuse that she rained down upon him went essentially unaddressed, as the two of them were the only ones in their home and there were no other adults present to witness or intervene on Mr. Addleman's behalf. The incessant abuse that comprised Mr. Addleman's everyday life while growing up made him hate himself. The only way he could even begin to try to make sense of why his mother treated him that way was to conclude that she felt like he did not deserve to live—a sentiment that he then internalized. Self-loathing to that extent as a child does not lead to positive outcomes, and such was the case for Mr. Addleman. From a young age, he began to engage in self-destructive behaviors because he did not see any other way to respond to or process what was happening to him. Thus did he descend into years of physical self-harm where he would cut or otherwise hurt himself, which included a suicide attempt in his teens. But none of these cries for help were answered, not even after he was briefly hospitalized at 15 following his suicide attempt. It was obvious that Mr. Addleman needed help at that point—mental health as well as substance abuse treatment—but that was not the result. He was advised to do just the opposite due to the fear of the stigma of mental illness. *Id.* ¶ 71.

The violence that Mr. Addleman experienced within his home was exacerbated by the community violence to which he was exposed outside the home, which bears repeating due to how horrible it was. When he was 10 years old, he used to get jumped and assaulted by older gang members while going to and from school. *Id.* ¶ 60. One time, he was stabbed while coming home from school and had to get stitches. *Id.* When he was 12, he witnessed another person being shot in the head. *Id.* When he was 25, he was shot twice—once in the hand and once in the foot—while with a friend who was targeted in a drive-by shooting. *Id.* The injury to his foot was serious enough that he could not walk for the next year. *Id.* What this all added up to was a life that taught him that he was never safe and that he had to do whatever he needed to in order to survive and protect himself. It also made him particularly vulnerable to pernicious outside influences from others, including gangs, who seemed to offer him some measure of protection and belonging that he never got at home. Once involved with that kind of life in the streets, Mr. Addleman could not see a way out.

None of Mr. Addleman's life experiences set him up for success or prepared him in any way to

1  follow the right path. He had no role models to speak of that would have helped to mitigate the lack

2  of guidance and the abuse that he was going through, or to help him develop better decision-making.

3  The damage that was done to him as a child was never undone or processed productively, and its

4  reverberating effects continued through his adulthood. His entanglements with the criminal justice

5  system only further solidified his long-held notion that he was worthless and did not deserve any

6  better. It will take a long time and a lot of work to mitigate the negative impact of that type of thought

7  process that has been reinforced for decades. Because of his mistakes here, he understands that the

8  foundation for that work will have to begin in custody.

9        There is ample reason to believe that in the right type of setting, Mr. Addleman can flourish

10  and can focus on the right priorities that will lead him to do better. While on pretrial supervision, he

11  made measurable progress towards rehabilitation and towards finally addressing his underlying

12  mental health and substance abuse issues. The Court is no doubt familiar with the challenges faced by

13  individuals who are trying to overcome what can be incredibly deep-rooted problems of this nature. It

14  is oft-said because it is true that relapse is part of recovery. Such was the case for Mr. Addleman,

15  who relapsed and fell back into old habits once he left the confines of the structured, supportive

16  inpatient environment that New Bridge had provided for him for 90 days. In truth, 90 days was not

17  enough for him to stably weather the transition back into the community. But his success at New

18  Bridge should not be discounted. During his time there, simply put, he thrived. He did so well that his

19  counselor submitted a letter of support to the Court describing how much he engaged with treatment

20  while in New Bridge and how much positive progress he made. *See* Dkt. No. 75-1 ("Nick

21  demonstrated a very strong willingness to changing his mindset to ensure long-term sobriety and

22  address personal challenges . . . Overall, [he] fully participated in treatment and ran a positive and

23  productive program."). It was only after Mr. Addleman transitioned back into the community and out

24  of that highly regimented environment that his old demons returned and got the best of him. What

25  this demonstrates is that Mr. Addleman's underlying issues required longer-term treatment in an

26  inpatient setting so that he could be more properly prepared for the obstacles and stressors that life

27  outside of an inpatient program brings with it.

28        He will have the opportunity to receive that type of long-term treatment in a custodial setting

through RDAP while in BOP custody. RDAP can take between nine and twelve months for an individual to complete—significantly longer than the 90 days that Mr. Addleman spent at New Bridge. Participating in that sort of intensive in-custody treatment for three to four times the length of time of a standard 90-day inpatient program will likely do wonders in providing Mr. Addleman with a stronger foundation and a more stable recovery than he had before. And as demonstrated by how he excelled at New Bridge, a highly structured program is exactly the type of setting that Mr. Addleman needs. RDAP will give him the space and strict guidance without external distractions to ensure that he is thoroughly prepared to re-enter society without succumbing to his past patterns. RDAP's approach of using cognitive behavioral therapy (CBT) in its model will prove invaluable to also addressing Mr. Addleman's co-occurring mental health struggles, given that CBT has been described as the "gold standard of psychotherapy" because of its effectiveness at treating various mental health conditions. *See* Daniel David et al., *Why Cognitive Behavioral Therapy is the Current Gold Standard of Psychotherapy*, 9 FRONTIERS IN PSYCH. 4 (Jan. 29, 2018) ("Therefore, CBT is, indeed, the *gold standard* in the psychotherapy field, being included in the major clinical guidelines based on its rigorous empirical basis . . . .").[1]

Mr. Addleman knows that he has made mistakes and that he must pay for those mistakes. That recognition is why he is now recommending a sentence that far exceeds what he had previously requested. But that is not all of who he is as a person. As attested to in multiple letters that were filed with the Court last year and additional letters submitted today, Mr. Addleman is a loving and devoted husband, father, and friend. *See* Dkt. Nos. 69-1, 70-1 (Exs. A–B, Letters of Support); Chuang Decl., Ex. D (Additional Letters of Support). It devastates him that because of his decisions, he will be separated from his family for a lengthy period of time. Their love and support is crucial to him now and will be crucial to him in the future. They will be his way out from the difficulties of his past, and they serve as living reminders that he is not worthless and that he has the capacity to be everything they need him to be.

The touchstone of his family has shown Mr. Addleman that he needs to turn things around and

---

[1] Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5797481/.

DEF'S SUPPL. SENT. MEM.
*ADDLEMAN*, CR 23–22 JD

to leave behind the negative influences that have derailed much of his life thus far. He knows he has put his family through the wringer and that it has to end if he wants to be meaningfully present in their lives. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

## CONCLUSION

For all the reasons set forth above and in previous filings, Mr. Addleman respectfully requests that the Court impose a sentence of 84 months to be followed by three years of supervised release. He further requests that the Court recommend to BOP that he participate in RDAP and that he be designated to a facility as close to Vallejo as possible. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).


Dated:      April 14, 2025                          Respectfully submitted,

                                                    JODI LINKER
                                                    Federal Public Defender
                                                    Northern District of California

                                                           /S
                                                    ANGELA CHUANG
                                                    Assistant Federal Public Defender